Argued February 7, modified February 29, 1916.

## GUSTIN *v.* GUSTIN.

(155 Pac. 370.)

**Divorce—Cruelty and Indignities—Sufficiency of Evidence.**

1. In a wife's suit for divorce for cruel and inhuman treatment and personal indignities rendering her life burdensome, evidence *held* sufficient to sustain decree for her.

[As to divorce on the ground of cruelty, see note in 65 Am. St. Rep. 69.]

**Divorce—Division of Property—Realty—Averment and Proof.**

2. In a wife's suit for divorce, where the complaint asserted that the description of the husband's realty was unknown, and asked that as soon as ascertained it might be inserted in the complaint, and the property divided, and the only description of the property in evidence

was the husband's, that he had "lot 2, block 39, block 47, and lot 70 in block 32," which would sell for $1,200, not stating the state, county or city, there was a failure of averment and proof as to the realty, so that no interest therein could be decreed to the wife.

**Divorce—Division of Property—Award in Lieu of Realty.**

3. In a wife's suit for divorce, where there is a failure of averment and proof as to the description of the husband's realty, the wife will be awarded one third of the value thereof as estimated by him in his testimony.

From Clatsop: JAMES A. EAKIN, Judge.

Department 2. Statement by MR. CHIEF JUSTICE MOORE.

This is a suit by Laura Gustin against Eli Gustin for a divorce on the alleged ground of cruel and inhuman treatment and personal indignities rendering her life burdensome. The complaint is in the usual form, and avers that the plaintiff is entitled to a share of the defendant's real and personal property, which, it is asserted, is of the value of about $5,000; "that the description of said real property is at the present time unknown to this plaintiff, and plaintiff asks that as soon as the correct description is known the same may be inserted herein, so that the property shall be divided between plaintiff and defendant."

The material allegations of the complaint having been denied in the answer, the cause was tried, and from the testimony taken findings of fact and of law were made in accordance with the averments of the complaint. The seventh finding of fact reads:

"That the description of said real property is as follows: Lot twenty (20) in block thirty-two (32) in Adair's Port of Upper Astoria, Clatsop County, State of Oregon, as laid out and recorded by John Adair, and subdivided by Bracker & Robb; and lot two (2) in block forty-seven (47) in Port Upper Astoria, Clatsop County, State of Oregon, as laid out and recorded by John Adair."

The ninth finding is as follows:

"That $500 is a reasonable amount for defendant to pay plaintiff as alimony and suit money in addition to what has already been paid."

Predicated on these findings a decree of divorce was given the plaintiff in conformity therewith, from which determination the defendant appeals.          MODIFIED.

For appellant there was a brief over the name of *Messrs. Norblad & Hesse,* with an oral argument by *Mr. A. W. Norblad.*

For respondent there was a brief with oral arguments by *Mr. Morris A. Goldstein* and *Mr. Frank S. Senn.*

Opinion by MR. CHIEF JUSTICE MOORE.

1. The evidence shows that, the defendant's wife having died, leaving four small children, he sent to Denmark the necessary transportation tickets, whereupon his wife's niece came to Astoria, Oregon, and began keeping house for him. Thereafter such housekeeper and the defendant were married, when he was 49 years old and she only 18. He owned a good home, had been for many years superintendent of the Astoria Box Company, at a good salary, was sober and industrious, and had money at interest. Soon after his second marriage he purchased a piano for the family and the plaintiff took music lessons. He had excellent credit at the grocery and dry-goods stores, the bills incurred at which he settled at the end of each month. Their home was supplied with every comfort that would tend to conduce to happiness. The plaintiff was always well dressed when making or receiving calls, and she moved in the best society in their vicinity.

The disparity in their ages, however, seemed to emphasize their respective likes and dislikes for matters relating to society and amusement. Thus, after a hard day's work in the mill, he was anxious to spend the evening at home, while she enjoyed going to dances held at a Danish lodge of which they were members, but to which he rarely accompanied her. He complained to her of the monthly bills which had been contracted, asserting that she was extravagant in these respects. She was afflicted with kidney trouble, and he found fault with her paying money for medicines and treatment for such ailment. Her requests for spending money were usually denied, with the assertion that he had none to bestow. This want of mutual sentiment and these disagreements begot discontent upon her part, and in consequence thereof she left him twice prior to their final separation on June 10, 1914. On one of these occasions they, on June 15, 1908, subscribed their names to a writing whereby she stipulated to release him from all obligations to support her, and agreed to contract no liabilities on his account. At the same time she also executed to him a quitclaim deed of all her right, title and interest in and to the real property particularly described in finding of fact No. 7 as hereinbefore set forth, and to other realty which was subsequently sold and conveyed. Though on the two occurrences mentioned the plaintiff returned to the defendant's home, their happiness was sometimes disturbed by recurrences of fault-finding, ill feeling and discord. She at one time, desiring to visit Portland, Oregon, asked him for money with which to defray the expenses of the trip. Instead of complying with her request, he purchased from her a silver coffee set, which she had received from Denmark as a wedding present, and paid her $10 therefor. She

wished to attend the Rose Carnival held in Portland in June, 1914, and again asked him for money with which to make the journey. He informed her he had only $2.50 at his command, which sum he desired to use to procure a pair of shoes. Upon her solicitation to borrow the necessary amount for the purpose of the trip, he refused to comply with her request, whereupon she informed him that unless he secured the money which she desired, she would leave him. The plaintiff testified that on the following morning the defendant ordered her out of the house, saying, if she did not go, he would throw her out, and, taking a chair, he threatened to strike her with it, and she was then obliged to leave their house. After the defendant had gone to his work, the plaintiff visited a store and obtained on his account a loan of $10, and also secured in the same manner a new trunk, into which she packed the silver coffee set which she had previously sold him, and also stored her wearing apparel and other personal property, and, going to Portland, Oregon, she secured employment as a house servant in a private family. The plaintiff further testified that in the presence of others the defendant frequently cursed and swore at her, calling her vile and opprobrious names. She is corroborated in these particulars by the testimony of her uncle, Ernest V. Jensen, and by that of her sister, Mrs. Crum. Their sworn declarations are much weakened, however, by the manifest interest they seemed to have in the plaintiff's cause and the prejudice they manifested toward the defendant. The latter had loaned $45 to Mr. Jensen, who appeared to resent the suggestion that any part of that sum should be repaid. Mrs. Crum's husband was accidentally killed in a logging camp near Astoria, Oregon, leaving her and a small child, who thereupon came to the defendant's

home, where they lived several months. He complained to his wife about being compelled to furnish board and lodging for his sister-in-law and her child, whereupon the child was left at his home, while its mother secured employment at a hotel. He continued to find fault, however, because the child was allowed to remain at their home. The plaintiff's sister was aware of such opposition, and undoubtedly felt aggrieved at his conduct in this particular. Whether or not her testimony, or that of her uncle, Mr. Jensen, was warped thereby, was for the trial court to determine in the first instance.

The plaintiff's counsel, on the cross-examination of the defendant, referring to Mrs. Crum and to Mr. Jensen, and also alluding to Mrs. Gustin, inquired:

"Well, I think they were the only ones that had testified that you had sworn and cursed, used vile language, and applied vile, mean and indecent epithets to her at sundry and various times; have you ever done so?"

The witness replied:

"No, sir.
"Q. Did you ever swear at her in your life?
"A. Not that I remember of."

On redirect examination the defendant's counsel, referring to the plaintiff and to the averments of the complaint, inquired of the witness:

"Did you ever call her any such names as b—h, son of a b—h, or tell her to go to h—l?"

He answered:

"No, sir; not to my recollection."

His other answers to questions imputing to him acts of cruel and inhuman treatment of, and personal indignities toward the plaintiff, as testified to by her,

Mrs. Crum and Mr. Jensen, received emphatic denials. When replies so quoted are read in conjunction with all other answers given by the defendant, it would seem that he was in doubt as to whether or not he had made the observations or pronounced the imprecation attributed to him. Considering these uncertain answers, in connection with the positive testimony given by the plaintiff, corroborated as it is by the sworn statements of Mrs. Crum and Mr. Jensen, and remembering that the trial court saw all the witnesses, and thus had an opportunity to note their manner and appearance when giving their testimony, it is believed the plaintiff was properly granted a decree of divorce.

2. There are no offspring as a result of this marriage, and hence the only remaining question to be considered is: What would be an equitable division of the defendant's property in order properly to support and maintain the plaintiff? The averment of the complaint with respect to the asserted inability of plaintiff's counsel properly to describe the defendant's real property, as hereinbefore quoted, was not amended at the trial. It will be kept in mind that a copy of the quitclaim deed, undertaken to be executed by the plaintiff to the defendant, was received in evidence. The real property described in the attempted conveyance undoubtedly furnished the evidence upon which the part of the decree awarding to the plaintiff one third of the premises is predicated. This deed, though signed, sealed, witnessed, acknowledged and delivered June 15, 1908, was not filed for record until six years and one day thereafter. The defendant, referring to 60.90 acres of land described in that deed, testified that such real property had been sold prior to the commencement of this suit, and that the proceeds arising from such sale, $2,550, had been loaned and was se-

cured by mortgages, giving the several sums so loaned. On cross-examination, in answer to the inquiry, "How much property have you got, Mr. Gustin?" the witness replied:

"I have got lot 2, block 39, block 47, and lot 70 in block 32, besides these notes and mortgages that I have. * *

"Q. What would it sell for?

"A. Well, I could not tell you, some $1,200 maybe, if you want to sell it. * *

"Q. Any encumbrances on this property?

"A. No, sir."

Comparing the description of the real property as given by the defendant with the recital thereof found in the deed and in the findings and decree, it will be seen that the witness omits the state, county, city or addition thereof in which the lots are situated; that one of the lots is not identified, and the other only partially so, if it be assumed that block 39, as first stated, was intended to be corrected to mean block 47. No other evidence was offered tending to show the real property specified in the decree constituted the premises which were owned by the defendant at the time of the trial. There was therefore a failure of averment and proof in this particular, and, this being so, no interest in the defendant's real property will be decreed to the plaintiff, and she will be barred from asserting any right, title or estate therein.

3. The only estimate of the value of the defendant's property was given by him, wherein he states the lots would in his opinion sell for $1,200 and that the mortgages which he held evidenced loans of $2,550, making a total of $3,750. The sum of $500, which was awarded to the plaintiff, will be affirmed. Instead of giving her an interest in the defendant's real property, she will be awarded one third of the value thereof, as

estimated by him, or $400, thus making the sum to be awarded $900.   One third of this sum to be paid within 30 days from the time the mandate herein is entered in the lower court, one third of such sum payable in one year, and the remainder in two years from that time, the deferred payments to bear 6 per cent interest per annum until paid, and to be a lien on any and all real estate owned by the defendant until such sum is paid.

The decree appealed from will therefore be modified, and one entered here according to the views expressed in this opinion.                              MODIFIED.

Mr. Justice Bean, Mr. Justice Burnett and Mr. Justice Harris concur.